**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| **v.** | * | |
| | * | |
| **LAURENCE J. BODE,** | * | **CRIMINAL NO. ELH 12-0158** |
| | * | |
| **Defendant** | * | |
| | * | |
| | * | |

**GOVERNMENT'S COMBINED RESPONSE TO DEFENDANT'S**
**MOTIONS TO SUPPRESS TANGIBLE AND DERIVATIVE EVIDENCE**
**AND FOR A *FRANKS* HEARING**

The United States of America, by its attorneys, Rod J. Rosenstein, United States Attorney for the District of Maryland, Judson T. Mihok, Assistant United States Attorney for said District, files this combined response to the Defendant's motions to suppress tangible and derivative evidence, as well as a motion for a *Franks* hearing.

**MEMORANDUM OF POINTS AND AUTHORITIES**

The defendant has moved to suppress tangible evidence seized on October 8, 2010, when a search warrant was executed at his residence located at 163 Winter Harbor Drive, Ocean City, Maryland, as well for a *Franks* Hearing regarding that same search warrant, and to suppress statements he made to law enforcement. A hearing is now scheduled for May 7th at 10:00 a.m. For the reasons that follow, the motions should be denied in all respects.

I. FACTS

The Defendant filed a substantive "Statement of Fact" section, and there are many facts that are not in dispute. However, there are a number of pervasive misconceptions in the Defendant's version of the facts. At the outset, the Government would like to clarify several of

these misconceptions: (1) www.Free6.com's ("Free6") servers were not in California operating on Pacific Standard Time (Def't. Memo Law-Suppress at 9), they were in Boston operating on Eastern Standard Time; (2) at all times relevant, SA Burdick was working in California and in PST; (3) the agents were not "recording" suspects (Id. at 7), but accessing stored communications in the form of logs organized and saved by Internet Protocol Address ("IPA")[1] for the preceding seven days; (4) SA Burdick did not contemporaneously view the messages of IPA 173.13.192.238 ("the Target IPA" or "the IPA") as those communications were posted (Id. at 9), but reviewed the previous seven days of chats logged by Free6 under that IPA on January 26, 2010 at approximately 7 p.m. EST, ten hours after those images related to the IPA had been posted; (5) the last activity of the IPA on January 26, 2010, was not a private chat (Id. at 4), but the posting of three images to the entire room; (6) the act of the banning of the IPA was not initiated or done by SA Burdick, and to the Government's knowledge, was not done or initiated by any law enforcement officer (Id.); and (7) while Comcast was no longer providing internet service at 163 Winter Harbor Drive (the "Subject Premises") as of on or about April 12, 2010 (Id. at 5), the Defendant was still receiving internet access as of the date the search warrant was executed (10/8/10), as further investigation prior to the search warrant showed (Def't. Att. 1, at 25-26), which the Defendant acknowledged during a non-custodial interview, and which was also confirmed by subsequent forensic analysis of the Defendant's computers.

The Government's recitation of the facts and response that follows will attempt to clarify the above facts, as well as summarize the remaining relevant facts. In addition, the Government will be providing both an unredacted version of the Defendant's Exhibit 9 and the four images

---

[1] Non-technically, an Internet Protocol address (IPA) is a number that is assigned to every device connected to the internet; mainly, an IPA provides an address or location for communications to be sent/received, akin to a telephone number.

that were presented to Magistrate Judge Bredar on October 5, 2010, *ex parte* and under seal. It is necessary to file and maintain these items under seal as both exhibits contain contraband in the form of child pornography, and the Government asks this Court to maintain controls over this evidence pursuant to 18 U.S.C. § 3509(m). The logs of the communications posted that were stored by Free6 are marked as Government's Exhibit 1, and the four image files associated with the search warrant application are marked as Government's Exhibit 2.[2] With regard to the logs (Exhibit 1), it is important to note that they were saved, and therefore printed, in order from most recently stored activity to oldest stored activity. To assist the Court with reading Exhibit 1 (and Def't. Att. 33-9), the Government provides the following key:

```
Created                     2010-01-26 09:11:10
Username                    DadsHome
toUsername
externalImageSrc            - 11 radator.jpg
chatImageSrc                50013767103086211641576235652348.jpg
REMOTE _ADDR                173.13.192.238
HTTP_X_FORWARDED_FOR        173.13.192.238
GEOIP_COUNTRY_CODE          US
[Ban User]
```

Gov't. Ex. 1 at 1; Def't. Ex. 33-9 at 1.

The "Created" time is the date and time the communication first appeared on Free6 and is in Eastern Standard Time. The "Username" is the name created by the user for this chat session. "toUsername" indicates whether the text or image was sent to a specified user or the entire chat room; when, as in this instance, "toUsername" is blank or listed as "null," then the text or image in question was posted to the entire chat room. "externalImageSrc" is the name of the file that was posted; when text is posted, this will read "undefined." "chatImagesSrc" is a unique number

---

[2] Three of the images are described in the Affidavit: Exhibit A, Exhibit B, and the image of two minors laying on the bed with the blue cover (Def't. Att. 1, at 13). The fourth image is a photo of the Defendant that was posted to Free6.

assigned to the picture by Free6; and again, when text is posted, this will read "undefined." The next two lines indicate the IPA responsible for posting the content in question. And, finally, the "Ban User" provides users on Free6 with the ability of clicking on this icon to flag another user's activity for review by a Free6 administrator to determine whether the IPA responsible for posting the content should be banned from Free6.

A.     BACKGROUND REGARDING THE OFFENSE CONDUCT.

On January 26, 2010, DHS/HSI SA Neil Burdick, RAC Los Angeles,[3] reported to work at his usual time, approximately at or after 8:30 a.m. PST, which would have been at approximately 11:30 a.m. EST. All times logged on Free6 are in EST as the servers for the site were located in Boston, Massachusetts. SA Burdick accessed the logs of stored Free6 activity and observed the activity of IPA 173.13.192.238 for the period from January 19, 2010, at 08:02:43, through January 26, 2010, at 09:11:25, at/after 4 p.m. PST/7 p.m. EST on January 26, 2010. This was more than 10 hours after the user had posted three images to the entire room (discussed more fully infra at 7-8) and the IPA had been banned. Subsequently, SA Burdick created a CD of these Free6 stored logs on January 26, 2010, at approximately 7:19:10 p.m. EST/4:19 p.m. PST.[4]

The earliest postings associated with this IPA stored by Free6 took place on January 19, 2010. When reviewing these logs on January 26, 2010, SA Burdick was able to observe that on January 19, 2010, an individual using the "username" of "DadsHome" and Internet

---

[3] SA Burdick now works out of DHS/HSI RAC Orlando, FL.
[4] The hard drive that SA Burdick saved the stored communications to showed a creation time for all of the files of 5:19 p.m. PST on January 26, 2010. SA Burdick then created the CD of these Free6 stored logs, which shows a creation time of 4:19 p.m. PST/7:19 p.m. EST. It appears the BIOS time on the computer was not set for daylight savings time, which explains the hour differential.

Protocol Address 173.13.192.238 was logged into a website located at "www.free6.com" (hereinafter, "Free6"). Between 08:02:43 and 08:39:49 on January 19, 2010, user "DadsHome," utilizing the above IPA, posted images with the following titles to the entire chat room: "-11 radator.jpg" (twice), "!!EATMOM.jpg" (twice), "!!3WAY.jpg" (twice), "2 Sara Weiss and Kara.jpg", "56.jpg", "074.jpg", and "07(1).jpg" (twice). Gov't. Ex. 1. During that same time frame, using the same username and IPA, the user posted the following messages to the entire chat room: "Good Morning all"; "Hello from Maryland"; "Hello from Beaches in Maryland"; "u see my pic"; "Hello Room"; and "Hi Moms and Daughters". Id.

Starting at 09:59:20 on that same day, and continuing until 10:28:20, the same IPA, but now with username "Mr4Play" posted the following images to the entire chat room: "- 11 radator.jpg" (twice), "!!EATMOM-1.jpg" (twice), "56.jpg", "074.jpg", "!!3WAY.jpg", "07(1).jpg" (twice), "____ohmom2-5.jpg" (twice), "2 Sara Weiss And Kara.jpg" (twice), and "3sara.jpg". Id. And "Mr4Play" posted the following messages in that same time frame to the entire chat room: "Good Morning"; "Hello from Maryland"; and "no wish lol". Id.

The file "- 11 radator.jpg" was **posted** by IPA 173.13.192.238 **four times to the entire chat room on January 19, 2010** alone, and multiple times over the course of seven additional sessions in the week that followed, was attached as Exhibit B to the search warrant application. Gov't. Ex. 1, 2; Def't. Att. 1, at 13. The search warrant lists the **eight additional dates and times**, as well as the screen names ("DadsHere," "DadsonCam," or "DadsHome"), that the user using this IPA **posted Exhibit B to the entire chat room**. Def't. Att. 1, at 13. The search warrant described Exhibit B as follows: "The image depicts two naked minor females, one

standing behind the other, where each is touching the other's pelvic area, and both are facing the camera." Id.

The file "____ohmom2-5.jpg" was **posted twice to the entire chat room on January 19, 2010**, alone, and multiple times over the course of the week that followed, was also described in the search warrant application: "This image depicts a naked minor female sitting on top of a naked adult female while grabbing her breasts." Id. at 15; Government's Exhibit 2. There is also a chart listing the other times "____ohmom2-5.jpg" was posted on Free6 by this IPA.

The search warrant also lists the dates and times that another image file, denoted as Exhibit A, was posted by this IPA on Free6. Gov't. Ex. 2; Def't. Att. 1, at 9-10. This file is entitled "~2spal02.jpg" and is an image file which contains two pictures, side-by-side. Those pictures were also described in the search warrant as follows:

> a.    The picture on the right shows an unidentified adult white female sitting on an unknown object. The adult female's torso is bare and her left breast is exposed. There is an unidentified white prepubescent female, approximately 8-10 years old, sitting on the right side of the adult female's lap. The prepubescent child is naked, her legs are apart, and the focal point of the image is the minor prepubescent female's vagina which is being displayed in a lewd and lascivious manner.
> b.    The picture on the left shows the same adult female and prepubescent child standing up. The adult female is only wearing knee-high white socks and white shoes. The prepubescent child is only wearing knee-high white socks and brown sandals. In this picture, the prepubescent child is using both her hands and is squeezing both exposed breasts of the adult female. The child is facing the adult while squeezing the adult's breasts. The child's genital area is not readily exposed in this particular picture.

Def't. Att. 1 at pp. 9-10.

Free6 captured logs of the activity of the individual using IPA 173.13.192.238 from seven additional sessions the week of January 19, 2010 through January 26, 2010: (1) on January

20, 2010, from 06:46:53 through 11:45:39, while using the username "DadonCam"; (2) on January 21, 2010, from 07:40:13 through 09:53:15, while using the username "DadsHere"; (3) on January 21, 2010, from 10:59:00 through 11:12:39, while using the username "Kim26Asian"; (4) on January 24, 2010, from 13:24:39 through 13:26:22, while using the username "Kim26Asian"; (5) on January 25, 2010, from 07:46:01 through 09:15:58, while using the username "DadonCam"; (6) on January 26, 2010, from 07:02:48 through 07:17:36, while using the username "DadonCam."; and (7) on January 26, 2010, from 09:10:56 through 09:11:25, while using the screen name "DadsHome."  Gov't. Ex. 1.  The search warrant details the images and messages posted during sessions 2, 5, 6, and 7.  See Def't. Att. 1, at 11-16.

With the exception of sessions 3 and 4, while the user was portraying (in texts and photographs) as an Asian female in her 20's, the chats and images posted have a common theme. For the over ten and a half hours accounted for in logged activity in that week alone, the user consistently posted graphic sexual images, to include images of child pornography, and engaged in sexually charged chats, most of which appear to relate to incest and sex with minors, both to the entire room and to some individual users, while interspersing photographs of the Defendant and personal information about the Defendant.

The personal information posted by the individual using this IPA to the Free6 site included, but was not limited to, identifying as "Larry," a 50 year old divorcee who lived on the water in Maryland.  Gov't. Ex. 1.  The user also posted several images of the Defendant that were taken from the same room and area where the computer was seized when the search warrant was executed.  In addition, there are images posted of what appears to be a clothed teenage girl who the user described as the user's 14 and 16 year old daughters that the user has in

the summer.  Some examples of other messages posted regarding these images include: "very much daughters 14 16 but look only admire" posted to username "dianemwf"; "Sara and Taras DAD here" posted to username "KathleenMommy" (using the username "Mr4Play"); "moms get away with it dads cant lol" posted to username "mandy-mum"; "lol teach me how to get with my kids lol" and "always in bathing suits 14 16" posted to username "june"; and "14 16 daughters" posted to username "mom36whipsgirl11".  Gov't. Ex. 1.

On January 26, 2010, from 09:10:56 through 09:11:25, while using the screen name "DadsHome", the user using the IPA posted three images to the entire room.  Gov't Ex. 1, at 1. One of those images is the "- 11 radator.jpg" file described above, and another is an image entitled "21e638.jpg", which depicts a young male who appears to be in his teens grabbing the exposed breasts of an adult female.  Id.  After posting these three images, an unidentified individual who was in the chat room at the time these images were posted must have clicked on the "Ban User" icon, which flagged this IPA for review by an administrator.  Thereafter, an administrator must have reviewed the offending images and made the determination that this IPA should be banned.  This IPA was neither flagged nor banned by SA Burdick.

After SA Burdick reviewed the stored communications regarding the flagged activity of the IPA, he conducted some additional investigation and eventually forwarded an investigative lead to DHS/HSI RAC Ocean City, Maryland.  The matter was assigned to SA Elizabeth Warchol.  After further investigation conducted by SA Warchol, an application was made for a search warrant for the residence associated with the IPA.  Additional information about the search warrant application process in this case is provided infra at C.  On October 5, 2010,

Magistrate Judge Bredar authorized a search of the Defendant's residence located at 163 Winter Harbor Drive, Ocean City, MD.

On October 8, 2010, that search warrant was executed. At that time, the Defendant was told that he was not under arrest and that he was free to leave at any time. After acknowledging that he understood, the Defendant agreed to speak with the agents. The Defendant stated, in sum and substance, that he had internet service at his residence.[5] Regarding Free6, the Defendant stated that he had heard about the Free6 website a long time ago in New York via email, and that he used Free6 on and off, once or twice a week, while he was residing in New York. The Defendant acknowledged that he had posted pictures of himself to Free6, and identified an image of himself that had been posted to Free6; further, the Defendant stated that he had posted images to Free6, and he acknowledged and signed the backs of two such photos, Exhibit A and Exhibit B. Exhibits A and B correspond with the images described in the search warrant and denoted as Exhibit A and Exhibit B. See Gov't. Ex. 2; Def't. Att. 1, at 11-13. The Defendant indicated that he sent these photographs so that others would be interested in communicating with him and that Exhibit A is more of an "unconditional love type thing."[6] The Defendant stated that he had never touched a child, but that he visited the websites, like Free6, as a form of release so that he would not cheat on his wife who was going through menopause. It should be noted that additional investigation did not reveal that the Defendant had any biological children.

Computers seized from the Defendant's residence were subsequently examined. Forensic analysis confirmed that on the Defendant's Gateway eMachine MFATXPNT, s/n 0029925792, and accompanying Maxtor Fireball 3 hard disk drive, s/n 2F040j0310613, there were images of

---

[5] While the Defendant indicated on October 8, 2010, that his internet service provided was Cablevision, it was actually Comcast.

[6] This exact image was described as "lol unconditional love" by user "DadsHere" to "mom36whipsgirl11" on January 21, 2010, at 07:45:57.

child pornography, including many of the same images posted to Free6, along with references related to Free6 and the screen names used on the site (e.g., "Mr4Play", "DadsHome", etc…). There were approximately 29 images and 2 videos of child pornography. There was also a history of search terms run looking for child pornography on the internet search engine Yahoo!, to include: "Lolita"; "Incesttaboo"; "Horney teen"; "Mother and daughter and father daughter and mother son, incest"; "Teen.ru"; and "Hottest incest."

One file recovered from that hard drive shows a created date of January 26, 2010, at 09:16:32. This file is a message that was received on the Defendant's computer and its contents read: "DadsHome banned Ip 173.13.192.238". This confirmed that just after the Defendant had logged on to Free6 in session 7, supra at 3, and posted the three images, two of which are described supra at 5, the IPA he was using had been banned from the site. This explains why IPA 173.13.192.238 had no additional activity logged on Free6. The flagging of this IPA by another user was also what brought the activity associated with this IPA to SA Burdick's attention.

While the Defendant was done with IPA 173.13.192.238 on Free6, and knew that he had been banned, he could not stay away. The forensic analysis also revealed that after being banned, the Defendant repeatedly accessed Free6 using a different IPA and other usernames through June of 2010.

      B.      ADDITIONAL INFORMATION REGARDING FREE6.

As explained in the search warrant, Free6 "offered some items for free viewing, such as images and links to various adult pornography websites."[7]  The search warrant described additional features of Free6:

> The Free6 website also offered a special "chat" feature where users were able to access an assortment of different "rooms."  In these Free6 chat rooms, a user was able to hold online text conversations, post messages, photos, graphics etc., to the entire room.  A user was also able to have "private" chats that were visible only to a specific user.

Def. Att. 1, at 5.

Accessing these Free6 chat features was a multi-step process.  First, the user would go to the main Free6 home page, and click on a button labeled "chat."  That took the user to a webpage where s/he was required to indicate whether s/he was male or female, and then select a screen name for that chat session.  Free6.com did not require users to enter their true identity or to register in any way with the website.  The screen name did not act as any sort of permanent account; it was only valid for the user's current chat session.  Users were able to use different screen names each time they logged into the chat portion of the website.  The webpage on which a user selects a screen name also showed the following warning banner:

> The Free6.com Chat rules Posting photos, graphics or cartoons showing persons under 18 years of age is not allowed.  **Child pornography or other illegal material will immediately be reported to the posters (sic) local authorities.**  Requesting images of the above nature is not allowed.  Spamming or advertising for websites or products is not allowed.  Users breaking these rules will be banned.  **All posted pictures and conversations, public and private, are logged and supervised.**

Def't. Att. 1, at 6-7 (emphasis added).

---

[7] The Defendant noted that SA Burdick's affidavit exemplar read, "Free6 appears to be a legal website featuring adult pornography", highlighting the absence of the word "legal" in SA Warchol's Affidavit.  Def't. Memo. Law-Suppress at 2, FN 1, Def. Memo. Law-*Franks* at 10.  Since adult pornography is legal, it is difficult to appreciate the distinction.

After the user entered a screen name, the second step required him/her to click on a button that said "Log In."  This took the user to a second warning banner.  This page featured a picture of a young girl and the words:

> CHILD PORNOGRAPHY…
> BEHIND EVERY PICTURE THERE IS PAIN!
> HELP US REPORT IT!
> Posting photos, graphics or cartoons showing persons under 18 years of age is not allowed.  **Child pornography or other illegal material will immediately be reported to the posters (sic) local authorities.**  Requesting images of the above nature is not allowed. **All posted pictures and conversations, public and private, are logged and supervised.**

Def't. Att. 1, at 6-7 (emphasis added).

The third step required a user to click on a button marked "ACCEPT," which was underneath the above posted warning, to proceed to the chat portion of the website.  Thus, each time a user wished to chat on Free6, s/he must first have viewed the warning, including the sentence that Free6 may disclose the communications to the authorities, and indicated that s/he accepted it.  One was not able to use the chat function by bypassing the warning, because even if a user had the specific Internet address of the chat room, they would have had no screen name to chat under.

As stated by the banner, Free6 did in fact log all posted images and conversations of users of its website.  Whenever users exchanged images and conversations, Free6 received and stored its own copy of those images and conversations.  These logs were stored by referencing the IPA that had posted the chat/file, so they did not include both sides of the conversation and images posted; to piece both sides of the text communications and files sent/received together from a particular chat session would have required searching through all the logs from a specific

date and time and cross referencing the usernames, then marrying the stored text sent and images posted for each IPA based on time/content. These logs were the property of Free6: website visitors had neither access to nor control over the logs. Only Free6 had the authority to delete the logs. Free6 typically maintained copies of logs for at least seven days; it could store logs for longer if it chose to do so.

1. SA Burdick's access to the Free6 site.

From October 27, 2008, through February 12, 2009, SA Burdick accessed the site as detailed above with the administrator privileges he had been granted. After making observations over that period of time, SA Burdick contacted the U.S. Attorney's Office for the Central District of California and consulted with an AUSA about follow up investigations and possible prosecution. That AUSA in turn consulted with the Computer Crimes Intellectual Property Section ("CCIPS"). Ultimately, out of an abundance of caution, it was decided that Free6's administrator should be asked if he would be willing to add the following language to the Free6 warning banner: "Free6 may disclose these communications to the authorities at its discretion." The administrator agreed, and the language was added on February 13, 2009. Afterward, the warning banner read:

> CHILD PORNOGRAPHY…
> BEHIND EVERY PICTURE THERE IS PAIN!
> HELP US REPORT IT!
> Posting photos, graphics or cartoons showing persons under 18
> years of age is not allowed. **Child pornography or other illegal
> material will immediately be reported to the posters (sic) local
> authorities.** Requesting images of the above nature is not allowed.
> **All posted pictures and conversations, public and private, are
> logged and supervised.** <u>**Free6.com may disclose these
> communications to the authorities at its discretion.**</u>

Def't. Att. 1, at 6-7 (emphasis added).

The banner was worded this way from February 13, 2009, until February 26, 2010, when the website was shut down. This is the banner that was in effect at all times relevant to this case as all activity associated with the IPA that resolved to the Defendant's residence occurred between January 19, 2010 and January 26, 2010.

After the underlined language above was added to the banner on February 13, 2009, SA Burdick began reviewing the stored communications of Free6 again, focusing mostly on IPA already flagged by other users. No use was made regarding the information developed by SA Burdick from October 27, 2008 through February 12, 2009. The last time SA Burdick logged onto Free6 and saw the warning was on February 25, 2010.

C.    ADDITIONAL BACKGROUND REGARDING THE SEARCH WARRANT APPLICATION.

In the Defendant's Motion, there is a reference to an earlier version of the search warrant for 163 Winter Harbor Drive, Ocean City, MD ("the Subject Premises") being denied by Magistrate Judge Gesner. Counsel undersigned informed Defendant's Counsel, as well as his two prior assigned attorneys, that said application had been made and that Magistrate Judge Gesner expressed concerns that the information was stale and that more information and investigation was necessary. Afterward, SA Warchol developed additional information which was incorporated into the Affidavit. In addition, a new section was added to the affidavit which incorporated legal analysis to address staleness concerns. See Def't. Att. 1, at 21-23. Once this information was added, Counsel undersigned called Magistrate Judge Gesner's chambers in an effort to schedule an appointment for review of the revised affidavit, but was referred to the duty magistrate which happened to be Magistrate Judge Bredar. Counsel undersigned explained to Magistrate Judge Bredar's chambers that a previous application for a search warrant for the same

Subject Premises had been made to Magistrate Judge Gesner who had concerns regarding staleness that were addressed in the new affidavit.

Magistrate Judge Bredar requested that Counsel undersigned report to chambers where these issues were discussed and the content of the search warrant was reviewed. Magistrate Judge Bredar suggested some edits to the search warrant, which were made and the search warrant was then returned to chambers. Then, Magistrate Judge Bredar consulted with Magistrate Judge Grimm. Afterward, Magistrate Judge Bredar indicated that two of the images described in the Affidavit constituted child pornography and should be both referenced and included as Exhibits. With references to Exhibit A (Def't. Att. 1, at 11) and Exhibit B (Id. at 13) penned in,[8] Magistrate Judge Bredar authorized the search warrant. Gov't. Ex. 2.

II.    LEGAL ANALYSIS

    A. ACCESSING FREE6'S STORED COMMUNICATIONS DID NOT VIOLATE THE
       FOURTH AMENDMENT BECAUSE THE DEFENDANT HAD NO
       REASONABLE EXPECTATION OF PRIVACY IN THEM.

As the Fourth Circuit has held, "In order to challenge a search under the Fourth Amendment, a defendant bears the burden of proving that he had a 'legitimate expectation of privacy' in the invaded place." *United States v. Bullard*, 645 F.3d 237, 242 (4th Cir. 2011). To demonstrate the existence of a legitimate expectation of privacy, a defendant "must have a subjective expectation of privacy, and . . . that subjective expectation must be reasonable."

---

[8] In the Defendant's Memorandum of Law in Support of the *Franks* Hearing, confusion is expressed over Exhibits A and B. See Memo. Law-*Franks* at 8, FN 3. Since the evidence in this case has been the subject of four separate evidence reviews with three separate attorneys, an investigator, and the defense retained computer forensic expert (who spent a total of seven days doing a forensic analysis in two separate blocks of time), it is difficult to imagine how there could be confusion. If there was confusion, clearly counsel for the Defendant, her investigator, or their retained forensic expert could have requested access to the evidence to alleviate any confusion.

*United States v. Bynum*, 604 F.3d 161, 164 (4th Cir. 2010). The burden is on the Defendant to prove his reasonable expectation of privacy. *Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978).

Importantly, the Supreme Court has made clear that individuals retain no reasonable expectation of privacy in information revealed to third parties, even if the senders have a subjective expectation that the third parties will keep the information confidential. See, e.g., *United States v. Miller*, 425 U.S. 435, 443 (1976) (abrogated, in part, by the "Right to Financial Privacy Act of 1978"); *Smith v. Maryland*, 442 U.S. 735, 743-44 (1979); *Hoffa v. United States*, 385 U.S. 293, 302 (1966).

In this case, the Defendant had no reasonable expectation of privacy in Free6's logs of his communications because they were the logs of Free6. The Defendant knowingly disclosed his communications to Free6, and he had neither possession, ownership, control, nor an expectation of privacy in these stored communications.

In particular, one has no reasonable expectation of privacy in the contents of a message one has sent to another. The Fourth Circuit applied this principle in *United States v. Horowitz*, 806 F.2d 1222 (4th Cir. 1986), a case in which the defendant emailed confidential pricing information relating to his employer to his employer's competitor. After the FBI searched the competitor's computers and found the pricing information, the defendant claimed that the search violated his Fourth Amendment rights. The Fourth Circuit disagreed, holding that the defendant relinquished his interest in and control over the information by sending it to the competitor for the competitor's future use. Id. at 1225-26. The Fourth Circuit explained that the defendant "never owned or possessed" the tapes that stored the messages he had sent. *Id*. at 1225. See also *United States v. Meriwether*, 917 F.2d 955, 959 (6th Cir. 1990) (holding that a defendant lacked

a reasonable expectation of privacy in a message (his phone number) sent to another through a pager system); *United States v. Charbonneau*, 979 F. Supp. 1177, 1184 (S.D. Ohio 1997) (holding that defendant does not retain reasonable expectation of privacy in contents of email message sent to America Online chat room after the message has been received by chat room participants).

In this case, the Defendant agreed (twice) to terms of service that informed him in no uncertain terms that all of his activity on the site would be logged by Free6 and that Free6 would maintain a copy of those communications. In addition, the Defendant acknowledged and accepted that Free6 could choose to share those logs with authorities at its discretion. The Defendant was on actual notice of all of these facts. Thus, when the Defendant sent a message or an image to anyone else on the website, he was also sending the message or image directly to Free6, which Free6 then held for its own purposes. In essence, users of Free6 carbon copied Free6 on all communications on the site. Under *Horowitz*, the defendant maintained no reasonable expectation of privacy in the Free6 logs of those communications.

More generally, in *United States v. Miller*, 425 U.S. 435 (1976), the Supreme Court held that a defendant had no reasonable expectation of privacy in his bank records because "the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed." *Miller*, 425 U.S. at 443. The Court explained that the bank's records "are not respondent's 'private papers'" but are "the business records of the banks" in which a customer "can assert neither ownership nor possession." Id. at 440. Similarly, because

the Free6 logs were the property of Free6, over which the Defendant could assert neither

ownership or control, the Defendant had no reasonable expectation of privacy in the Free6 logs.

See also *United States v. Young*, 350 F.3d 1302, 1307-08 (11th Cir. 2003) (holding that Federal

Express terms of service, which allowed it to inspect the contents of packages, eliminated any

reasonable expectation of privacy in the contents of a package).

Defendant's reliance on *United States v. Warshak*, 631 F.3d 266 (6th Cir. 2010) is

misplaced. In *Warshak*, the court held that a subscriber retained a reasonable expectation of

privacy in the content of his email stored in his own email account; his service provider retained

only limited authority to access his subscriber information "in the operation of the Service and as

necessary to protect the Service." *Warshak*, 631 F.3d at 287. But the Sixth Circuit

acknowledged that "if the ISP expresses and intention to 'audit, inspect, and monitor' its

subscriber's emails, that might be enough to render an expectation of privacy unreasonable." Id.

Here, the Free6 went even beyond auditing, inspecting, and monitoring contents of

communications in a user's account: they posted an actual warning and kept their own log of all

customer communications through their website, logs which a user could not access. A user has

no expectation of privacy in such logs.

        1.   The Defendant consented to Free6's disclosure of his communications to
            the Government.

Even if this Court finds that the Defendant maintained a reasonable expectation of

privacy in Free6's logs of his communications, Free6's disclosure of his communications to the

Government did not violate the Fourth Amendment because he expressly consented to that

disclosure. "[C]onsent to search provides an exception to the Fourth Amendment's warrant and

probable cause requirements." *United States v. Ortiz*, 669 F.3d 439, 445 (4th Cir. 2012). "Once

a defendant voluntarily gives consent, a search that falls within the scope of that consent is constitutionally permissible." Id. at 445; *United States v. Workman*, 80 F.3d 688, 693 (2d Cir. 1996); *United States v. Simons*, 206 F.3d 392, 398 (4th Cir. 2000) (defendant consented to employer internet policy regarding monitoring of internet use, so no reasonable expectation of prvivacy); *United States v. Hamilton*, 701 F.3d 404, 409 (4th Cir. 2012) (employer policy regarding emails overcome marital communications privilege).

Here, the defendant voluntarily consented to Free6 logging his communications and disclosing them to the government.  He was explicitly informed that "[p]osting photos, graphics or cartoons showing persons under 18 years of age is not allowed," that "[c]hild pornography or other illegal material will immediately be reported to the posters local authorities," that "[a]ll posted pictures and conversations, public and private, are logged and supervised," and that "Free6.com may disclose these communications to the authorities at its discretion."  He then clicked "accept" to these conditions multiple times.  The Defendant, therefore, expressly consented to all of Free6's subsequent actions as those actions fell squarely within the scope of the Defendant's consent.  Precisely as the Defendant agreed, Free6 logged his communications and subsequently disclosed them to the Government.

      2.  Free6 had common authority to consent to disclosure of its logs to the Government.

Regardless of the Defendant's consent to disclose logs of his communications to the Government, Free6 had sufficient authority over its logs to allow it to disclose them to the Government.  "A third-party has authority to consent to a search of property when she possesses 'common authority over or other sufficient relationship to the . . . effects sought to be inspected." *United States v. Buckner*, 473 F.3d 551, 554 (4th Cir. 2007) (quoting *United States v. Matlock*,

415 U.S. 164 (1974)).  A party has common authority over property where it has "joint access or control from most purposes."  *Matlock*, 415 U.S. at 172 n.7.  Here, at a minimum, Free6 had common authority over the logs it kept of communications on its server.  The logs were owned and maintained at the discretion of Free6, for its own purposes, and Free6 had exclusive control over the logs.  This authority over its logs establishes its common authority under *Matlock*.  See *Young*, 350 F.3d at 1308-09 (holding that Federal Express's terms of service, which authorized it to inspect packages, gave it common authority to consent to a government search of a package).

While the Defendant attempts to highlight a distinction between Free6's logs which were stored communications of messages and images posted to the entire room and those posted to a specified Free6 user, there is no legal distinction to be drawn.  The Defendant was on actual notice (which he acknowledged and accepted twice while logging in to Free6) that Free6 both stored and monitored these communications, regardless of whether they were posted to the entire room or a specified user.  Therefore, the Defendant had no reasonable expectation of privacy any of these communications, no search warrant was required for SA Burdick to review these stored communications, and there was no Fourth Amendment violation.

B.  THE ACT OF ACCESSING LOGS OF STORED COMMUNICATIONS DID NOT VIOLATE THE WIRETAP ACT.

In addition to arguing that his communications should be suppressed under the Fourth Amendment, the Defendant argues that he is entitled to statutory suppression under the Wiretap Act.  *See* Memo. Law-Suppress at 6; Memo. Law-*Franks* at 8-9.  This argument is doubly mistaken.  First, all of the communications of the defendant obtained by Free6 and the United States are electronic communications, and the Wiretap Act includes no statutory suppression for

interception of electronic communications. Second, neither the United States nor Free6 violated the Wiretap Act.

As an initial matter, the Wiretap Act's statutory suppression remedy applies only to oral and wire communications, not electronic communications. See 18 U.S.C. §§ 2515, 2518(10)(a) (providing statutory suppression remedy for "any wire or oral communication" intercepted in violation of the Wiretap Act). Critically, the Wiretap Act provides no suppression remedy for electronic communications. *See United States v. Barajas,* __ F.3d __ , 2013WL781789 at *7 n.5 (10th Cir. March 4, 2013); *Meriwether*, 917 F.2d at 960; *United States v. Reed*, 575 F.3d 900, 915 (9th Cir. 2009); *United States v. Amanuel*, 615 F.3d 117, 125 (2d Cir. 2010); *see also* 18 U.S.C. § 2518(10)(c) ("The remedies and sanctions described in this chapter with respect to the interception of electronic communications are the only judicial remedies and sanctions for non-constitutional violations of this chapter involving such communications.").

In this case, the United States obtained only the Defendant's electronic communications, not wire or oral communications. While wire and electronic communications may both be transmitted by wire, "wire communications" by definition convey a human voice, while "electronic communications" do not. *See* 18 U.S.C. § 2510 (1), (12), (18). None of the communications that the Defendant seeks to suppress were spoken; all, accordingly, were electronic communications. Thus, the Wiretap Act does not apply as there is no statutory suppression remedy for the Defendant's electronic communications.

Moreover, even though the Wiretap Act's statutory suppression remedy does not apply to electronic communications, neither the United States nor Free6 violated the Wiretap Act. The Wiretap Act does not prohibit interception of a communication "where one of the parties to the

communication has given prior consent to such interception." *See* 18 U.S.C. § 2511(2)(c), (d).

As discussed previously, the Defendant consented to the interception of his communications: he

agreed that Free6 could log his communications and disclose them to the government.[9]  Because

the Defendant expressly consented to Free6's logging and disclosure of his communications, this

logging and disclosure do not violate the Wiretap Act.

        In addition, SA Burdick did not intercept the Defendant's communications because he

did not obtain them contemporaneous with their transmission.  Under 18 U.S.C. § 2510(4),

"intercept" is defined to mean "the aural or other acquisition of the contents of any wire,

electronic, or oral communication through the use of any electronic, mechanical, or other

device."  At first glance, this definition might seem to simply require acquisition of information.

But this definition is built upon the definitions of "wire communication" and "electronic

communication," which are themselves defined by statute as "transfers."  In particular, the core

of the definition of "wire communication" is "any aural transfer," and the core of the definition

of "electronic communication" is "any transfer of signs, signals, writing, images, sounds, data, or

intelligence of any nature," other than wire or electronic communications.  18 U.S.C. § 2510(1),

(12) (emphasis added).  Thus, the statutory language includes a contemporaneity requirement by

defining "intercept[ion]" as the acquisition of a wire or electronic communication and defining

"wire communication" and "electronic communication" as transfers.

        Five other courts of appeals have endorsed the contemporaneity requirement for

electronic communications in the Wiretap Act, and no court of appeals has rejected it.  See, e.g.,

*Steve Jackson Games, Inc. v. United States Secret Service*, 36 F.3d 457, 461-62 (5th Cir. 1994)

---

[9] Consent may be either express or implied.  See *United States v. Amen*, 831 F.2d 373, 378 (2d Cir. 1987).  Here,
where the Defendant clicked to accept the Free6 terms, he granted Free6 express consent to log his communications.
If a website were to display terms like the Free6 but not require users to expressly accept them, consent may be
implied from a customer's continued use of the site.

(holding that acquisition of sent but not yet received email was not an interception and emphasizing that Congress used "transfer" but not "storage" in the definition of "electronic communication"); *United States v. Smith*, 155 F.3d 1051, 1057 (9th Cir. 1998) (holding, under the pre-2001 definition of "wire communications," that retrieval and recording of a voice mail was an interception, but stating that the contemporaneity requirement for electronic communication, which includes transfers and excludes storage, "fits like a glove"); *Konop, v. Hawaiian Airlines, Inc.*, 302 F.3d 868, 878 (9th Cir. 2002) (viewing of messages on password-protected bulletin board was not an interception); *United States v. Steiger*, 318 F.3d 1039, 1047-49 (11th Cir. 2003) (anonymous source who copied information from defendant's hard drive did not intercept communications); *Fraser v. Nationwide Mut. Ins. Co.*, 352 F.3d 107, 113-14 (3d Cir. 2003) (company did not violate Wiretap Act by accessing employee's email); *Meriwether*, 917 F.2d at 960 (obtaining stored information from pager did not violate Wiretap Act).

However, the First Circuit has suggested that the contemporaneity requirement, which was developed during the era of telephone wiretaps, may not be apt to address issues involving the application of the Wiretap Act to electronic communications. *United States v. Councilman*, 418 F.3d 67, 79-80 (1st Cir. 2005) (en banc) (citing *In re Pharmatrak, Inc. Privacy Litigation*, 329 F.3d 9, 21 (1st Cir. 2003).

In this case, as clarified in the Government's "BACKGROUND REGARDING THE OFFENSE CONDUCT" (supra at 4), SA Burdick did not obtain communications contemporaneous with their transmission. SA Burdick reviewed these communications at approximately 4 p.m. PST/7 p.m. EST; this was ten hours after the IPA had posted the last of the offending images. By the time SA Burdick reviewed the stored activity of the IPA for the

preceding week, that IPA had been banned from Free6 for approximately ten hours. Thus, these communications were not reviewed contemporaneously or even close in time to when the communications were sent. These communications were reviewed ten hours after the Defendant had pressed send, after they were received by the user to whom the Defendant was transmitting them, and while they were in storage.

Therefore, there was no Wiretap Act violation. It is noteworthy that the Defendant cited no legal authority to support its position, but instead appeared to rely on an article posted on an internet "news" source. See Memo of Law-Suppress at 10, FN 8. As clearly indicated in this response, the Wiretap Act has absolutely no application to this case.

### C. THE SEARCH WARRANT PROVIDED PROBABLE CAUSE TO SEARCH THE DEFENDANT'S RESIDENCE.

The Defendant next raises two grounds attacking the probable cause determination made by the Magistrate Judge who signed the search warrant. First, the Defendant argues that the search warrant was stale. Second, the Defendant asks this Court to find that the images described and provided to the Magistrate Judge, two of which the issuing Court determined were child pornography, were not in fact child pornography, but instead constituted child erotica. The Defendant then seeks to suppress on the grounds that the search warrant lacked probable cause. Both arguments lack merit and the motion should be denied.

The judicial finding of whether a warrant demonstrates probable cause is determined through a "totality of the circumstances" test. *Illinois v. Gates,* 462 U.S. 213, 230-231 (1983). The totality of the circumstances test requires an issuing magistrate judge to make a "practical, common-sense decision whether, given all the [relevant facts and] circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a

particular place." Id. at 238. Great deference is to be given to a magistrate's determination of probable cause. See *Spinelli v. United States,* 393 U.S. 410, 418 (1968) (overruled on other grounds); See also *United States v. Jones*, 31 F.3d 1304, 1313 (4th Cir. 1994)*; United States v. Williams*, 974 F.2d 480, 481 (4th Cir. 1992). The inquiry is directed to whether the magistrate had a substantial basis for the conclusion that probable cause existed. Id. at 481. In order to find probable cause, the facts presented to the magistrate need only "'warrant a [person] of reasonable caution in the belief' that contraband or evidence of a crime will be found in the place to be searched." *Jones*, 31 F.3d at 1313 (quoting *Texas v. Brown,* 460 U.S. 730, 742 (1983) (plurality opinion)). The probable cause standard "does not demand any showing that such a belief be correct or more likely true than false." *Jones*, 31 F.3d at 1313 (internal quotations omitted).

In *Illinois v. Gates*, 462 U.S. 213 (1983), the United States Supreme Court set the standard for probable cause necessary to support the issuance of a search warrant. There the Court held that "the term 'probable cause,' according to its usual acceptation, means less than evidence which would justify condemnation . . . it imports a seizure made under circumstances which warrant suspicion." *Id.* at 235 (internal citations omitted). The Court continued, "Finely-tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence, useful in formal trials, have no place in the magistrate's decision . . . it is clear that only the probability, and not a prima facie showing, of criminal activity is the standard for probable cause." *Id. Gates* makes clear that probable cause does not require a showing of actual criminal activity at a specific location. The Supreme Court has observed that, "doubtful cases should be resolved in favor of upholding the warrant." See *United States v. Ventresca*, 380 U.S. 102, 106 (1965).

1. The search warrant was not stale.

The information provided in the search warrant, which concerned internet activity that was just over eight months old at the time the search warrant application was made, as well as more recently updated background investigation and information, was not stale.

In addition to the images distributed by the IPA over the course of the seven internet sessions, there were also many chats posted by this same user that clearly were sexual in nature, focusing mainly on incest. This information also included posts about the user's two daughters regarding whom the user is clearly expressing a sexual interest. See supra at 7-8.

There was also other personal information about the user, such as his name, age, and occupation, which was the subject of further investigation. These efforts are detailed in the search warrant application. Def't Att. 1, at 23-26. Substantial investigation was also invested in determining whether or not the Subject Premises had internet service. A mere 11 days prior to the search warrant being signed it was established that the Subject Premises was receiving internet service, details also included in the Affidavit. Id. at 25-26.

In addition the search warrant included details about the characteristics of child pornography collectors. Id. at 16-19. This factor, when coupled with the increased storage capacity of computers over time (Id. at 20) and the ability of forensic examiners to recover data, even long after it has been deleted, (Id. at 19-20), compels the conclusion that the search warrant in this case was not based on stale information. Review of case law as stated in the search

warrant supports the Magistrate Judge's finding in this case that there was probable cause, and therefore, that the search warrant was not stale.  See, Def't. Att. 1, at 21-22.  See also, *United States v. Morales-Aldahondo*, 524 F.3d 115, 119 (1st Cir. 2008) (three-year-old information not stale where the defendant subscribed to a commercial child pornography Web site); *United States v. Eberle*, 266 F. App'x 200, 206 (3d Cir. 2008) (four-year-old information not stale where the information suggested that the defendant sexually assaulted and videotaped a minor, even where the warrant application did not include evidence of child pornography on the defendant's computer); *United States v. Silva*, 2009 WL 1606453, at *5-6 (W.D. Tex. June 8, 2009) (sixteen-month-old information that the defendant purchased and accessed child pornography Web sites not stale because those facts indicated that defendant had a sexual interest in children); *United States v. Newsom*, 402 F.3d 780, 783 (7th Cir. 2005) (one-year-old information that defendant produced, possessed, and received child pornography not stale where facts suggested that defendant still had the year-old images or something similar on his computer and where informant recently discovered the clips of her daughter); *United States v. Lemon*, 590 F.3d 612, 614-15 (8th Cir. 2010) (information supporting probable cause for search warrant not stale even though eighteen months passed between exchange of pornography and search warrant application because the nature of defendant's crime, including his previous exchange of child pornography and statements during online chat room conversations expressing his interest in the same, supported categorization of defendant as a "preferential collector of child pornography"); *United States v. Lacy*, 119 F.3d 742, 745 (9th Cir. 1997) (ten-month-old information that defendant possessed child pornography not stale where defendant received child pornography from a foreign computer bulletin board system and downloaded at least two picture files

containing child pornography and where court concluded that the nature of the crime suggested that the computerized visual depictions would be present in defendant's apartment ten months later).

As the Seventh Circuit explained recently, while it was *possible* that with the passage of time a deleted file could be overwritten, and thus lost forever, or *possible* that a computer could be sold or destroyed, "rarely" will these "possibilities" be "*so* probable as to destroy probable cause to believe that a search of the computer will turn up the evidence sought; for probable cause is far short of certainty—it 'requires only a probability or substantial chance of criminal activity, not an actual showing of such activity,' *Illinois v. Gates*, 462 U.S. 213, 244 n. 13 (1983), and not a probability that exceeds 50 percent ('more likely than not') either." *United States v. Seiver*, 692 F.3d 774, 777 (7th Cir. 2012). In denying the motion, the Seventh Circuit noted, "Only in the *exceptional* case should a warrant to search a computer for child pornography be denied" on the grounds that it is stale. Id. at 778 (emphasis added). The search warrant established probable cause to search the Subject Premises; it was not stale, and the motion should be denied.

2. The Magistrate Judge determined that the images constitute child pornography, which is entitled to great deference.

The Defendant next argues that the search warrant lacked probable cause because the images described and provided to the Magistrate Judge did not, in fact, constitute child pornography. As stated supra at 22, the Magistrate Judge's determination that the images constituted child pornography and that there was probable cause is entitled to substantial deference. For support, the Defendant points to an instance in a report authored by SA Warchol where one of the images is described as constituting erotica. However, as stated above, the only

finding that really matters is that of the Magistrate Judge and the case law establishes that this

finding does, in fact, really matter.

When reviewing the images described in the search warrant and included as

Government's Exhibits 1 and 2, the jury instructions are helpful:

> "Sexually explicit conduct" means actual or simulated sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; bestiality; masturbation; sadistic or masochistic abuse; or lascivious exhibition of the genitals or pubic area of any person.
>
> The term "lascivious exhibition" means a depiction which displays or brings to view to attract notice to the genitals or pubic area of children in order to excite lustfulness or sexual stimulation in the viewer. Not every exposure of the genitals or pubic area constitutes a lascivious exhibition. In deciding whether the government has proved that a particular visual depiction constitutes a lascivious exhibition, you should consider the following questions:
>
> Whether the focal point of the visual depiction is on the child's genitals or pubic area, or whether there is some other focal area.
>
> Whether the setting of the visual depiction makes it appear to be sexually suggestive, for example, in a place or pose generally associated with sexual activity.
>
> Whether the child is displayed in an unnatural pose, or in inappropriate attire, considering the age of the child.
>
> Whether the child is fully or partially clothed, or nude, although nudity is not in and of itself lascivious.
>
> Whether the visual depiction suggests sexual coyness or a willingness to engage in sexual activity.
>
> Whether the visual depiction is intended or designed to elicit a sexual response in the viewer.  It is not required that a particular visual depiction involve all of these factors to be a lascivious exhibition. The importance which you give to any one factor is up to you to decide.

Sand, Modern Federal Jury Instructions, 62-23.

These instructions, especially those addressing the setting of the visual depiction and the pose and clothing of the child make it clear that these images are in fact child pornography. The Magistrate Judge's determination that these images constitute child pornography should not be disturbed.

Moreover, the determination regarding probable cause is based on a totality of the circumstances test. In this instance, the search warrant details extensive posting activity, both texts and images. All of this information should be considered by this Court. The texts posted by the IPA in this case go well beyond "sexual banter" on an adult website (Def't. Memo. Law-Suppress at 18) as characterized by the Defendant; these communications discussed incest and sexual urges involving minors. Gov't. Ex. 1.

Even if this Court determines that the images presented to the Magistrate Court did not constitute child pornography, this Court can still conclude that the search warrant established probable cause to search the Subject Premises. Courts have held that there is probable cause to search based on: (1) images characterized as child erotica (See *United States v. Rochelle*, 2006 WL 3297877 (5th Cir. 2006), *United States v. Ranke*, 2010 WL 4386917 at*7 (E.D.MI 2010) (leaving open the possibility that probable cause may be met "in a child pornography investigation even if the affidavit does not describe any illegal child pornography") or obscenity (*United States v. Testerman*, 263 Fed.Appx. 328, 330-31 (4th Cir. 2008)); (2) texts alone with no images posted whatsoever (See *United States v. Rogers*, 165 Fed.Appx. 873, 874 (2d Cir. 2005)); and (3) the act of subscribing to a website or email distribution groups making child pornography available (See *United States v. Moyer*, 256 Fed.Appx. 61, 62-63 (9th Cir. 2007), *United States v. Shields*, 458 F.3d 269, 278 (3d Cir. 2006)). In this case, the search warrant established extensive

activity on a website associated with the trading of child pornography that was the subject of an active investigation (to include details of results of investigations of other targets from the Free6 site (see, Def. Att. 1, at 10-11), as well as extensive posting activity of both images and texts that were mainly focused on incest and an interest in sex with minors.

The Defendant cites to *United States v. Hansel*, 2006 WL 3004000 (N.D. OH 10/20/06), for support that child erotica alone does not establish probable cause for a search warrant. However, that case is easily distinguished. In that case, the district court did not hold that child erotica by itself could never provide probable cause to search; instead, the district court stated, "Possession of child erotica, …, is not itself illegal and might not alone be sufficient to provide probable cause to believe that the Defendant possesses child pornography." Id. at *11. Ultimately, the district court considered the possession of child erotica, along with other factors, and concluded that the search warrant provided probable cause to search the location. As in this case, the images were not sent in a vacuum: there were texts and suggestive screen names, all in a place where it was confirmed child pornography was actively being traded. Based on the totality of the circumstances, there was a fair probability that the evidence sought would be found at the Subject Premises. The motion to suppress should be denied as there was probable cause to search.

In addition, as stated earlier, SA Burdick did not violate the Fourth Amendment by accessing Free6's logs of stored communications of activity on its website. Since the Defendant was on actual notice of this monitoring, there is no distinction to be drawn between logs of stored communications that were posted to the entire room and logs of stored communications posted to a specified user. However, if this Court does draw a distinction between Free6's stored

communications that were posted to the entire room and those posted to a specified user on Free6 for Fourth Amendment purposes, the motion still fails. The search warrant details several instances when images of child pornography and sexually charged texts regarding incest and a sexual interest in "young" were posted to the entire room, so, even if this Court were to strike the text and images posted by the IPA to specified users, the search warrant still provided probable cause to search the Defendant's residence. One act of posting child pornography is enough to provide probable cause. The motion to suppress should be denied.

    D. THE DEFENDANT'S STATEMENTS WERE VOLUNTARILY MADE IN A NON-CUSTODIAL SETTING, SO THEY SHOULD NOT BE SUPPRESSED.

The Defendant next moves to suppress the statements the Defendant made to the agents on October 8, 2010, the day the search warrant was executed, arguing that these statements were "the fruit of the poisonous search." Def't. Memo. Law-Suppress at 20. However, the Defendant was only interviewed after he acknowledged that he was not under arrest and that he was free to leave at any time, and indicated that he was willing to speak with the agents, and he voluntarily did so. In addition, the Defendant was not arrested at the conclusion of the interview. Therefore, the interview was non-custodial and voluntary. As such, no *Miranda* warnings were required. The motion to suppress the Defendant's statements should be denied.

*Miranda* warnings, and the accompanying Fifth and Sixth Amendment rights, are only required when the suspect is subject to custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436, 478 (1966); see also *United States v. Dickerson*, 120 S.Ct. 2326 (2000). Therefore, if the suspect is not in "custody," no warnings are required. Furthermore, the police do not have to read *Miranda* the moment they have probable cause to arrest. "Law enforcement officers are under no constitutional duty to call a halt to a criminal investigation the moment they have the minimum

evidence to establish probable cause, a quantum of evidence which may fall short of the amount necessary to support a criminal conviction." *Hoffa v. United States*, 385 U.S. 293 (1966).

Whether a person is in custody under a Fifth Amendment analysis is whether there was formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. *California v. Beheler*, 463 U.S. 1121, 1125 (1983); see also *Oregon v. Mathiason*, 429 U.S. 492, 495 (1997). Whether someone is in custody is determined by an objective test. *Stansbury v. California*, 114 S.Ct. 1526 (1994). Merely because a suspect is the focus of a law enforcement inquiry does not mean that he is in custody for *Miranda* purposes; it is the perception of a "reasonable person" under the circumstances which determines whether *Miranda* should be given. *Beckwith v. United States*, 425 U.S. 341 (1976). The reasonable person test presupposes an innocent person. *Florida v. Bostick*, 501 U.S. 429, 438 (1991); *United States v. Galloway*, 316 F.3d 624, 629 (6th Cir.2003) (internal quotation marks omitted) (custody analysis from the perspective of a reasonable person " innocent of any crime."); accord *United States v. Street*, 472 F.3d 1298, 1309 (11th Cir.2006); *United States v. Wauneka*, 770 F.2d 1434, 1438 (9th Cir. 1985).

The cases cited by the Defendant for support that the Defendant's statement in this case should be suppressed are inapplicable. Those cases relate to the situation where a defendant was unlawfully arrested and then interviewed. Def't Memo. Law-Suppress at 21-22. First of all, the search in this was legal. Second of all, the Defendant consented to being interviewed after being told he was not under arrest and was free to leave. And third, the Defendant was not arrested at the conclusion of the interview; in fact, the Defendant was never arrested on the charges pending

in this Indictment—he was allowed to turn himself in the day that the initial appearance and arraignment were scheduled.

The Government will call a witness at the hearing to testify about the circumstances surrounding the Defendant's statements on October 8, 2010. A confession is presumed involuntary, and the government has the burden to show, by a preponderance of the evidence, that a confession is voluntary. *Lego v. Twomey*, 404 U.S. 477, 482-84 (1972); *Colorado v. Connelly*, 479 U.S. 157 (1986). The Government will establish by a preponderance of the evidence through this testimony that the statements made by the Defendant on October 8, 2010, were voluntary and not in violation of *Miranda*.

E. THE DEFENDANT IS NOT ENTITLED TO A *FRANKS* HEARING.

There is a presumption of validity with respect to the affidavit supporting a search warrant. *Franks v. Delaware*, 438 U.S. 154, 171 (1978). In order to attack an affidavit in support of a search warrant, the defendant carries the burden to show that the affiant knowingly or intentionally, or with reckless disregard for the truth, included a false statement that was necessary to the finding of probable cause. *Id*. at 156-57. A defendant can also meet this burden by showing that certain facts were intentionally omitted, and that the omission was designed to mislead, thereby making the affidavit deceptive. *United States v. Tate*, 524 F.3d 449, 454-55 (4th Cir. 2008).

If a defendant can make a substantial preliminary showing that the affidavit omitted material facts that, if included, would have defeated a probable cause showing, he may be entitled to an evidentiary hearing to further challenge the veracity of the affidavit which the

warrant was based on. *Id*. at 455. But this is a heavy burden, and as the Supreme Court explained in *Franks*:

> To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. [Any] allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons.

*Franks*, 438 U.S. at 171.

The Defendant has simply not met his burden. The Defendant has failed to point to any material fact that was omitted from SA Warchol's affidavit, much less how any allegedly omitted or misrepresented fact would have diminished any finding of probable cause. The motion should be denied and no hearing is necessary.

All three grounds raised by the Defendant lack merit. First, as already discussed supra at 15-22, there was no Wiretap Act or Fourth Amendment violation. Second, the fact that the banner was changed at the request of law enforcement was not omitted for any nefarious purpose; in fact, it is logically inferred from the substantial facts established in the search warrant. Third, regardless of how an earlier report prepared by SA Warchol characterized the images, it is the Magistrate Judge's determination that matters, and in this case, the Magistrate Judge determined that the images depicted child pornography (Exhibit A and B), and that the search warrant provided probable cause. The motion for a *Franks* Hearing should be denied as the Defendant has not met his burden.

1. The officers in this case acted in good faith.

For reasons that are not entirely clear, the Defendant appears to argue that the good faith exception should not apply to this case. The Defendant seems to suggest that if this Court

determines that one of the other grounds supports suppression, that this Court should apply that finding in a way that effectively ignores the good faith exception. However, that is simply not the law.

If this Court finds that the warrant lacked probable cause, the agents were still justified in relying on it as they were acting in good faith. See *United States v. Leon*, 468 U.S. 897 (1984) (holding that evidence should not be suppressed when it was seized in reasonable, good-faith reliance on a search warrant subsequently held to be defective).

The standard for determining whether an affidavit is "so lacking in indicia of probable cause" as to render a belief in its existence unreasonable is a less demanding showing than the "substantial basis" threshold required to prove the existence of probable cause in the first place. *United States v. Carpenter*, 360 F.3d 591, 595 (6th Cir. 2004). As the Sixth Circuit stated in *United States v. Washington*, 380 F.3d 236 (6th Cir. 2004): "Thus, it is entirely possible that an affidavit could be insufficient for probable cause but sufficient for 'good-faith' reliance." *Id.* at 241.

In addition, the warrant in this case was not a "bare bones" affidavit. A "bare bones" affidavit "is one that states suspicions, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge." *United States v. Van Shutters*, 163 F.3d 331, 337 (6th Cir. 1998). The warrant in this case sets forth facts observed by SA Burdick and SA Warchol during substantial background investigations of the activity that was connected with an IPA that resolved to the subject premises, as well as additional background investigation linking this Defendant and this conduct to that residence. Therefore, the search warrant was not based on a bare bones affidavit, and the agents who executed the

warrant acted in reasonable good faith in relying on it.  The officers were justified in proceeding

to search the premises, as authorized by the warrant, as they were acting in good faith.  See

*United States v. Leon*, 468 U.S. 897 (1984).  The officers acted reasonably based on the totality

of the circumstances.  The motion to suppress should be denied.

  F.  THE GOVERNMENT REQUESTS THAT THE COURT SUMMARILY DENY
   ALL BUT THE DEFENDANT'S MOTION WHICH SEEKS TO SUPPRESS THE
   STATEMENTS MADE BY THE DEFENDANT.

   The Defendant has raised a plethora of issues to be handled at the suppression hearing.  It

is the Government's position that the Defendant has not met his burden in establishing: (1) a

violation of the Wiretap Act; (2) a violation of the Fourth Amendment based on the warrantless

seizure of communications the IPA posted to the site which were stored by Free6; (3) that the

search warrant lacked probable cause because it was stale; (4) that the search warrant lacked

probable cause because the images shown to the Magistrate Judge were child erotica, not child

pornography; and (5) the need for a *Franks* Hearing.  It is the Government's position that this

Court should deny the motions brought on grounds (1) through (5), and that no hearing on the

merits is necessary.  If the Court denied the above motions, that would leave as the sole motion

for the evidentiary hearing the motion to suppress the statements made by the Defendant as

involuntary and/or made in violation of *Miranda*.

   After the Defendant has had an opportunity to file a reply, but in advance of the April

May 7th hearing, the Government respectfully requests that this Court provide some direction and

define the parameters of the hearing so the Court's time is not wasted and the parties can focus

their arguments/presentations on the issues that the Court wants to address.  In addition, to the

extent that the Defendant may seek to call a witness at the hearing, the Government demands all

discovery pursuant to the previously executed discovery agreement and Rule 16. To date, the Government has not received any discovery from the Defendant.

Therefore, the Government respectfully requests that this Court deny the Defendant's motions to suppress as there was no Fourth Amendment or Wiretap Act violations committed when SA Burdick reviewed the stored communications of Free6 associated with the IPA, that the search warrant provided probable cause, that there was no *Miranda* violation and the Defendant's statement was voluntarily made, and that there is no need for a *Franks* Hearing.

Respectfully submitted,

Rod J. Rosenstein
United States Attorney

By:_____
Judson T. Mihok
Assistant United States Attorney